IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2021

**JAMES BLACK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Greene County**
No. 19CR273      Alex E. Pearson, Judge

_____

**No. E2020-01008-CCA-R3-PC**

_____

The Petitioner, James Black, was convicted of two counts each of first-degree premeditated murder and first-degree felony murder and was sentenced to a concurrent life sentence by the trial court. On appeal, the Petitioner argues that he received ineffective assistance of counsel stemming from trial counsel's legal use of prescribed opioids during his trial, specifically asserting that 1) the prescribed opioids caused him to perform deficiently at trial; 2) that trial counsel's offering of the Petitioner's criminal history tainted the jury; and 3) that trial counsel's use of prescribed opioids combined with his severe back pain created a conflict of interest. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Brandon A. Potter, Knoxville, Tennessee, for the Petitioner, James Douglas Black.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Cecil Mills and Ritchie Collins, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner's convictions stem from the March 11, 2012 shooting deaths of Courtney Thompson and Terrence Stewart. State v. James Douglas Black, No. E2017-00542-CCA-R3-CD, 2018 WL 4026974, at *1 (Tenn. Crim. App. Aug. 22, 2018). After planning and preparing to rob the victims, the Petitioner was riding in Thompson's vehicle with the victims and his two co-defendants, Christopher Jones and Tabitha Whitlock, when

he shot the victims in the head. Id. Both victims died as a result of the gunshot wounds. Id. The Petitioner removed pills, money, and a firearm from Thompson's clothing. Thompson was a known drug dealer. Their bodies were discarded under a bridge. Id. The trio then took Thompson's Honda to the apartment Whitlock shared with Stewart. Id. at *4. The Petitioner and his co-defendants cleaned the blood from Thompson's vehicle. Id. The Petitioner removed two firearms from the safe and took blankets to cover up blood stains in Thompson's car. Id. Petitioner drove Thompson's Honda to Perkins Restaurant and abandoned it in the parking lot. Id. The co-defendant's followed in Stewart's BMW. Id. The Petitioner later abandoned Stewart's BMW. Id. The Petitioner was convicted of first-degree premeditated murder and first-degree felony murder and received concurrent life sentences. Id. at *17. This court remanded the case to reflect merger of the Petitioner's four murder convictions but otherwise upheld the convictions on direct appeal. Id. at *20. On May 13, 2019, the Petitioner filed a pro se petition for post-conviction relief, which was amended by appointed counsel and filed on January 21, 2020.

**Post-Conviction Hearing.** At the February 28, 2020 post-conviction hearing, trial counsel testified that he had practiced criminal law for almost 40 years and tried "hundreds" of cases. Trial counsel explained that he was "diagnosed with severe arthritis in [his] lower back" a couple of years prior to the Petitioner's first trial.[1] Trial counsel went to his doctor on "a Friday before" trial started, and his doctor conducted MRIs of his back and informed him that he was "a hundred percent disabled because of severe arthritis in [his] lower back, both sides." The doctor prescribed an opioid, but trial counsel stated that the drugs "had no effect on the pain at all[,]" and the only side effects were his "face became blood red[,]" and the color blue looked different. Trial counsel said that he stopped taking the opioid "after a day or two." He agreed that he took the opioid and an anti-inflammatory during that "day or two."

Trial counsel agreed that in his opening statement, he told the jury that he "d[id]n't feel well today." He explained that he informed the jury that he did not feel well because of the pain but denied feeling "any mental effects[.]" Trial counsel stated that he informed the court of his "severe" back pain "in case there was ever a question at any point in the future." He affirmed that he had to sit down a lot during the trial due to his back pain but reiterated that the "chemicals weren't affecting [his] outlook at all[,]" despite saying that he was not "as sharp as he normally" was during his opening statement. Trial counsel testified that after his opening statement, the trial court stopped and asked him if he was "sharp" and "fully available to try the case[.]" He said the prosecution also "stepped in to vouch that [trial counsel was] okay to move forward[.]" Trial counsel stated that he would

---

[1] The record reflects that the Petitioner's original trial was declared a mistrial "due to the prosecution volunteering the [Petitioner]'s criminal history." The Petitioner's second trial is at controversy in the instant appeal. Trial counsel represented the Petitioner in both the first and second trials.

not have made "any changes in [his] strategy or anything[.]" He explained that he moved forward with trial, despite his severe back pain, because the Petitioner "thought he had a good case" and "very much wanted to move forward." Trial counsel agreed that the trial court had stopped him during opening statements for "becoming a little bit too aggressive" but explained that that was a tactic.

Trial counsel testified that he had to sit "throughout the whole trial" due to his back pain and agreed that he did normally sit during similar trials. He reiterated that although the pain was distracting, he "could overcome the distraction" because he had "back problems [his] entire life." Trial counsel did not serve as appellate counsel for the Petitioner so that he could go to rehabilitation for his back. He explained that he "prepare[d] the issues and d[id] the notice of appeal" before having the trial court appoint another attorney.

Trial counsel stated that he only objected to leading questions when "the questions are disadvantageous to [his] client[.]" He explained that some leading questions were "technically leading" but did not hurt his case and that sometimes the prosecution is "bringing out evidence that you actually want to come out" by asking leading questions. Trial counsel stated that he "wouldn't be surprised at all" to learn that there were "at least 70 leading questions that were objected to" during the Petitioner's trial. He elaborated that there were "hundreds and hundreds of questions asked over these week-long trials," and many he did not object to "unless it [was] something specific that [he was] objecting to." Trial counsel was asked about the following specific questions asked by the prosecution that he did not object to:

> Q: I think you had given her a silver chain and cross that she had on the night she died.
>
> Q: You weren't trying to hide anything?
>
> Q: You have not been avoiding anybody these past five years?

Trial counsel disagreed that these questions would bolster the credibility of the witnesses to whom they were directed.

Trial counsel agreed that he "accept[ed] input from [his] clients" regarding which witnesses to call at trial. Trial counsel explained that he was not able to find "a lot of the witnesses that [the Petitioner] wanted [them] to put on[,]" including some that were "hiding out from [him,]" and some of the witnesses that the Petitioner wanted to call "were not going to give information that was helpful to him." Trial counsel elaborated that he only called witnesses that "were going to be an advantage to [his] case." He stated that a lot of

the witnesses in the instant case "were in the drug business and did not want to have anything to do with the judicial procedure at all." Trial counsel explained that he did not call Fred Greene as a witness, despite preparing him for court, because he realized "his testimony was not going to be beneficial" after speaking with him. With respect to Teresa Miller, trial counsel testified that he did not call her as a witness, despite her proclaiming the Petitioner's innocence at the preliminary hearing, because she was "under threat of indictment" and was "represented by counsel." Further, the State "had her there that day," and trial counsel was "under the impression the State was going to call her." The State did not call Miller because she was "such an unreliable witness." He affirmed that he had seen a copy of the letter written by Miller claiming the Petitioner's innocence. Trial counsel explained that he had gone to visit William Spurling in prison at the request of the Petitioner. He did not call Spurling as a witness because Spurling "recanted" after stating that he would "help [them] out." Trial counsel did not call Tracy Gibble as a witness because she, and every other witness that he chose not to call, "were going to hurt [their] case."

Trial counsel testified that the Petitioner's first trial resulted in a mistrial after trial counsel objected to co-defendant Jones testifying that they met while incarcerated together. He explained that he had questioned Lieutenant Mike Fincher, who had conducted a traffic stop of the Petitioner, regarding pulling the Petitioner over for being on probation because he "didn't want the jury to think that he had been pulled over because of the death of these two young people[,]" and he "wanted to limit that impact upon the jury" as much as possible. Trial counsel agreed that there was no physical evidence placing the Petitioner at the murder scene. He elaborated that he was able to elicit on cross-examination that the State had run phone records "showing that [the Petitioner] wasn't there." Trial counsel elicited from the State's witnesses that the Petitioner's "knee [was] fused" and "pointed [] out" to the jury that the Petitioner could not sit in the backseat of Thompson's car "if his leg's frozen out straight[.]" Trial counsel "had a lady come and visit" the Petitioner regarding his disability but did not call an expert witness because "it was just nothing that [they] couldn't show otherwise." He stated that he "brought out to the jury that he perhaps had been disabled, on disability insurance or something, received some money." Trial counsel said that in retrospect, he would still go forward with the Petitioner's trial despite his back pain.

On cross-examination, trial counsel agreed that he had received verdicts of "not guilty" in his previous three murder trials. He also agreed that he had received "not guilty" verdicts in other murder trials, including one in the "late 1990s" where there were "130 witnesses" against his client. Trial counsel explained that he did not take many appointed cases but took the Petitioner's case because the "PD's office, the judge, et cetera" called him and asked if he would represent the Petitioner. He testified that he used two investigators in the Petitioner's case and that trial counsel, his secretaries, and the two

investigators reviewed all the State's evidence and list of witnesses. Trial counsel and the investigators had "go[ne] to the car" that the victims were killed in. Trial counsel noted that there was no blood found on the Petitioner despite there being blood all over the vehicle. He also thought it was "critical" that there was a pillow in the backseat that was "laid down and apparently had not been moved, which meant there were only two people in the back." Because the State had already charged the co-defendants with murder, that meant the Petitioner "could not have been in the back, especially when you factor in that he had a bum knee which kept his leg from bending." Trial counsel stated that he and his investigators had also measured the backseat of the vehicle to determine whether the Petitioner "could have actually been in that back[.]" He made that argument "to everyone, including the prosecutors," throughout the trial.

Trial counsel testified that before the Petitioner's first trial, he filed approximately forty-seven motions. The list of his filed motions was received as an exhibit. Trial counsel discussed the "factual defenses [he] explored" with the Petitioner. The defenses included that there was no physical evidence produced by the State tying the Petitioner to the murders; that the Petitioner could not physically fit in Thompson's vehicle; that there was no blood or DNA found on the Petitioner; and that there was no evidence tying the Petitioner to where the victim's bodies were discarded. Trial counsel also explored legal defenses with the Petitioner, including that he did not commit the murders because he was not present; that he had said "over a hundred times during questioning" that he did not commit the murders; and that there was no physical proof he was present. He agreed that he had explained all of the elements that would be required for the Petitioner to be found guilty and that the Petitioner had "appear[ed] to understand" those elements. Trial counsel stated that he met with the Petitioner approximately a dozen times over the course of both trials. Because the Petitioner maintained that he did not commit the murders, he did not want to take any plea deals from the State.

Trial counsel agreed that he brought his pain and prescription opioid to the attention of the court. The prosecutors in the trial told the trial court that they had not noticed anything about trial counsel's performance that would affect his ability to represent his client. He affirmed that the trial court had not taken him into chambers to question his performance, and the Petitioner's friends and family, who were present at trial, did not question his performance. Trial counsel testified that he was able to elicit from one of the witnesses that she had "never mentioned the [Petitioner] in relation to this case until five years later." He was also able to elicit that the victim was so close to" the Petitioner that she referred to him as "Pops." Trial counsel utilized that testimony to demonstrate that the Petitioner "loved [Ms. Thompson] and wouldn't have killed her. Acted like that was his daughter."

Trial counsel believed that co-defendant Jones was the shooter and that co-defendant Whitlock had shot Ms. Thompson in the face because he "had seen evidence that she was jealous of" Ms. Thompson, and it was his "experience in dealing with many homicides that men just don't generally do anything to destroy a woman's looks like that." Trial counsel was able to elicit from co-defendant Whitlock that she was afraid of co-defendant Jones because he became violent "when he was high[.]" Trial counsel was also able to get co-defendant Jones to "admit before this jury in this contested trial that he had lied under oath before[.]" He explained that he did not call Teresa Miller as a witness because he learned that her attorney had prepared an affidavit of allocution and a statement in which Miller said that the Petitioner had "planned to rob" Ms. Thompson because she had a lot of money. The affidavit of allocution was received as an exhibit. Trial counsel agreed that in his cross-examination of Lieutenant Vincent Tweed, he was able to elicit that Tracy Gibble purchased a .380 Smith & Wesson from co-defendant Jones, which was recovered with the murder weapon.

Trial counsel reiterated that he did not object to leading questions unless he had a specific objection, because "[o]therwise the jury might be left with the impression that you're trying to keep information from them, which can turn the jury against you[.]" Trial counsel stated that he had co-counsel on the case, who was previously a federal prosecutor. He further testified that the Petitioner's trial was somehow docketed for a date when he was supposed to be on vacation in Mexico, and he stayed behind to try the case while "[e]veryone else went" on vacation." Trial counsel elaborated that the Petitioner "had been in jail a long time" and "made it clear he wanted this trial . . . completed[.]"

On redirect examination, trial counsel reviewed a letter that Miller sent to the Petitioner's appellate counsel after the conclusion of trial claiming the Petitioner's innocence. Trial counsel testified that Miller "said at least a hundred times that [the Petitioner] didn't do anything. She said it over and over and over again in all sorts of different ways." However, Miller "then did a 180 and was going to say terrible things about" the Petitioner. Trial counsel agreed that the letter was "certainly consistent with some of the things [Miller] said."

On March 27, 2020, the post-conviction court entered a written order denying the Petitioner's petition for post-conviction relief. In the order, the post-conviction court accredited trial counsel's testimony and found that the Petitioner "failed to overcome the presumption that his trial attorney's conduct falls within the range of competence demanded of attorneys in criminal cases." The post-conviction court further found that "the overall proof in the underlying trial coupled with the proof offered in the post-conviction hearing leads to the conclusion that [the Petitioner] was not prejudiced by any ineffectiveness of [trial counsel]." The Petitioner filed a notice of appeal on July 30, 2020.

## ANALYSIS

On appeal, the Petitioner contends that trial counsel was ineffective because he used pain medication during trial, arguing that such ineffectiveness was demonstrated by his failing to object to leading questions, failing to introduce evidence of the Petitioner's phone records, and failing to call several witnesses. The Petitioner further argues that trial counsel was ineffective in introducing evidence of the Petitioner's prior criminal history. He finally asserts that trial counsel's back pain and opioid use created a conflict of interest between trial counsel and the Petitioner. The State responds that the Petitioner "did not offer any evidence to support any of his claims[,]" and "the post-conviction court properly concluded that [trial counsel] was not ineffective in representing the [P]etitioner." We agree with the State.

We must initially address the Petitioner's late-filed notice of appeal. The record shows that although the Petitioner's judgment was entered on March 25, 2020, and filed March 27, 2020, he did not file his notice of appeal until July 30, 2020.

Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from . . . ." However, this rule also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). This court, in deciding whether to grant a waiver regarding an untimely notice of appeal, "shall consider the nature of the issues for review, the reasons for the delay in seeking relief, and other relevant factors presented in each case." Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App. Feb. 13, 1996). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver. If this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (citing Michelle Pierre Hill, 1996 WL 63950, at *1).

The Petitioner filed a notice of appeal on July 30, 2020, 127 days after the trial court entered its judgment. In the notice of appeal, the appellate counsel asserted that he did not receive notice of a final judgment until June 18, 2020. We note that even if he received notice on June 18, 2020, the notice of appeal was still filed forty-two days after that date. However, given that appellate counsel states he had "delays in communication with the Petitioner, making filing the Notice of Appeal by the deadline an impossibility" due to the continued difficulties caused by the ongoing COVID-19 pandemic, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998).

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). To establish prejudice in the context of a guilty plea, a petitioner must show that, but for counsel's errors, the petitioner would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing

Hill v. Lockhart, 474 U.S. 52, 59 (1985)). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner contends that because of trial counsel's use of the prescribed opioid during the first two days of trial and his continued back pain, he was "forced to be seated during the majority of the trial," "failed to object to at least seventy (70) leading questions," including the questions trial counsel was specifically asked about at the post-conviction hearing, "failed to call important witnesses[,]" and failed "to use exculpatory evidence."

We have reviewed the record and conclude that the Petitioner has failed to demonstrate deficient performance or prejudice based on co-counsel's alleged impairment due to his two-day use of prescribed painkillers and his back pain. To the contrary, the record reflects that trial counsel zealously advocated on the Petitioner's behalf and made tactical decisions based on his forty-year experience and multiple previous "not guilty" verdicts. With respect to trial counsel's failure to object to seventy leading questions, trial counsel testified at the post-conviction hearing that he only objected to leading questions if he had a specific objection and tried to refrain from doing so as a tactical decision. He explained that constantly objecting could lead to the jury "turning against" his client because of the appearance of wanting to keep information from the jury. The post-conviction court found trial counsel's withholding of objections to be an acceptable trial tactic and noted that although his co-counsel also failed to object, the Petitioner did not have any complaints against co-counsel. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982).

With respect to failing to call "important witnesses[,]" trial counsel testified at the post-conviction hearing that he did not call witnesses who would hurt the Petitioner's case. He explained why he purposefully chose not to call Teresa Miller and Tracy Gibble as witnesses, and the post-conviction court accredited his testimony. As noted by the post-conviction court, an affidavit of allocution and a letter, both written by Miller, were received as exhibits. The two were in direct contradiction to each other, with one proclaiming the Petitioner's innocence, and the other describing how the Petitioner "planned to rob" Thompson. Trial counsel explained that he did not call Gibble because she was going to hurt the Petitioner's case, but he was able to elicit that she had purchased a firearm from co-defendant Jones through his cross-examination of Lieutenant Tweed. Neither Miller nor Gibble testified as the post-conviction hearing, and it is unclear what their testimony would have constituted. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit the witnesses might have offered to the Petitioner's case. Id.

The Petitioner also asserts that trial counsel's failure to introduce the Petitioner's phone records demonstrates his ineffectiveness caused by his pain and use of opioids. Trial counsel testified at the post-conviction hearing that he was able to elicit through cross-examination of the State's witnesses that the Petitioner's phone location at the time of the murders did not place him at the scene. The post-conviction court noted that there was evidence at trial that the Petitioner had given his cell phone to Miller prior to the murders and that he had called Miller from a payphone after the murders. The Petitioner has failed to demonstrate how trial counsel's choice not to enter his actual phone records into evidence constitutes deficient performance or caused him any prejudice.

Next, the Petitioner asserts that trial counsel was ineffective in eliciting testimony from Lieutenant Fincher that he conducted a traffic stop of the Petitioner because he had violated probation. Specifically, trial counsel asked Lieutenant Fincher, "You, in fact, pulled him over for a probation?" It was further established that the Petitioner was on probation for driving on a suspending license and without insurance. At the post-conviction hearing, trial counsel testified that introducing the Petitioner's probation violation was a trial tactic meant to prevent the jury from assuming that he had been pulled over because he was an active suspect in a double-murder investigation. The Petitioner likens this introduction to that of the cause for mistrial in the Petitioner's mistrial, where co-defendant Jones testified that he met the Petitioner while they were incarcerated together. However, the two pieces of testimony are easily distinguishable. The Petitioner meeting his co-defendant while they were both in prison could only lead to a negative inference made by the jury, while learning that the Petitioner was pulled over by police only for violating his probation, stemming from driving on a suspended license, could, as

- 10 -

trial counsel testified, prevent the jury from believing that the Petitioner was pulled over because he was actively considered a murder suspect. The post-conviction court found that this choice was "an appropriate trial technique." As noted above, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See Hellard, 629 S.W.2d at 9. The Petitioner has failed to demonstrate deficient performance or prejudice.

Finally, the Petitioner contends that the trial court itself created a conflict of interest between trial counsel and the Petitioner by failing to "replace[] [t]rial [c]ounsel" or "take[] adequate steps to determine if the risk of conflict was too remote to warrant separate counsel[.]" We note that this is an entirely different conflict of interest argument than what was raised in the Petitioner's petition for post-conviction relief and addressed in the post-conviction court's order denying relief. In the petition, the Petitioner asserted that "the pain medication conflicted with the responsibilities and duties [c]ounsel was required to provide the Petitioner." In its order denying relief, the post-conviction court found that the Petitioner "complain[ed] of a failure to report a conflict of interest during trial based on . . . [trial counsel] taking medication and . . . suffering from serious back pain[.]" The post-conviction court found this complaint to be "baseless because obviously everyone involved in the trial[,] including the judge, co-counsel, opposing counsel, and [the Petitioner] all knew about the medication and back pain" because it was discussed in open court on the record. Because the instant conflict of interest issue is completely different than the one raised in the post-conviction petition and as addressed by the post-conviction court, we conclude that this issue is waived. See Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.").

Waiver notwithstanding, nothing in the record suggests that the trial court had a personal "interest" in proceeding with the second trial as scheduled, despite the Petitioner's questioning "why the trial court was so insistent on having this case heard." Trial counsel testified at the post-conviction hearing that the Petitioner had been in jail for a long time and was adamant that he wanted his case heard because he thought he had a good case, even knowing about trial counsel's back pain and use of painkillers. Further, the record reflects that the trial court did "take adequate steps" to determine if trial counsel was able to continue the trial, evidenced by the trial court's questioning trial counsel, co-counsel, and the prosecutors.

The Petitioner has failed to establish ineffective assistance of counsel, and he is not entitled to relief.

\

## CONCLUSION

Based upon the foregoing reasoning and analysis, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE